Case No. 16-5356, et al., Federal Trade Commission Appellate v. Boehringer Ingelheim Pharmaceuticals, Inc. Mr. Hegedus for the appellant, Mr. Rosenberg for the appellee. Good morning, Your Honors. Mark Hegedus for the Federal Trade Commission. May it please the Court. I will start with the attorney-client privilege issue that the FTC raised in its appeal. The District Court committed an error of law when it found documents privileged just because they were requested by Boehringer's General Counsel, Marla Persky, and concerned business deals used to settle litigation. She was also a senior vice president and had non-legal business roles at the company, as this Court recognized in the first Boehringer decision in these proceedings. The District Court should have required Boehringer to make a clear showing that Persky sought the documents to provide legal advice, but it did not. Instead, the Court assumed, based upon the overtones of the documents and Persky's title as a lawyer, that it was sufficient for Boehringer to make the showing that the documents were privileged. There are four key facts that demonstrate that Boehringer did not meet their burden. First, Boehringer's privilege log did not state or otherwise indicate that the documents were requested or created for the purpose of legal advice. Second, Persky testified repeatedly that Boehringer assigned her responsibility to negotiate the business terms and the economic terms of these business deals. Third, Persky repeatedly testified that the analyses supplied to her by business people were for the purpose of assessing whether or not these agreements made sense from a business and financial perspective. And finally, the District Court specifically found that none of the documents indicated that they were used for the purpose of discussing antitrust liability. With respect to the privilege log entries, it's notable that the differences in entries between where Boehringer claimed that the documents were created for the purposes of legal advice and where they did not. If I could point the Court's attention to document entry number 617, which is found at Joint Appendix page 331. There, Boehringer claims that the document is attorney-client privilege, but there is no description of the document as being created for the purpose of legal advice. By contrast, document number 1542, there Boehringer claims the privilege as well, but specifies that the document was created for the purpose of legal advice. How do we draw the line between what the lawyer is doing in providing legal advice and what the lawyer is doing in assessing the business or economic implications of the transaction? Your Honor, there is instructive teaching from a number of cases that have looked at the question of whether or not a company claiming the privilege has made the clear showing. For example, in this Court's decision in Sealed Case 1984, the Court examined the responsibilities of in-house counsel. Similarly, in that case, the Court examined the contents of the communication to determine whether or not it involved a legal issue. In another case cited in the briefs, the Second Circuit's decision in Enright County of Erie, the Court examined whether or not the document was generated with the lawyer acting in a capacity as a lawyer. I guess I understand all that. In applying those general principles to something like this, where you're assessing all the ramifications of a potential settlement, the lawyer is going to want to know all the different facets of the situation, including the economic facets. I guess I'm struggling, and this may relate to the KBR case too a bit, how we do that in any principled way. I'm thinking about it in two ways. How do we decide in a principled way, but for all of you in the bar, how do we provide a rule that gives you guidance going forward about what is going to be privileged and what isn't? Because that's one of the big things we have to think about in a case like this, I think, too. Are we setting forth clear enough lines for the bar going forward? Yes, Your Honor. And that kind of guidance, I think, will be important. It's similar to the guidance that this Court provided in the first Behringer decision with respect to the distinction between opinion work product and fact work product. So there are a number of facets to the answer. One is the case law that I was just discussing, where you see courts not relying upon ex parte affidavits, but actually looking at the documents, looking at the facts surrounding the creation of the document. The law does draw a distinction between documents relied upon a lawyer to understand the business ramifications that were created not for the purpose of providing legal advice, but the lawyer was interested in some business documents to inform her legal opinion. And those documents are not protected by the privilege under the Supreme Court's Fisher decision. Pre-created documents. Documents that weren't created for the purpose of advising the lawyer. Correct, Your Honor. So that's a distinction, I think. When the lawyer says to people in the company, I'm trying to advise the board, I'm trying to advise the CEO, I'm trying to advise whoever on whether this makes sense to settle legally. I need to know some financial information. And that information is then provided. Is that privileged or not? The company claiming the privilege needs to demonstrate that each of the documents for which it claims the privilege were covered by this request. And the... I assume it is. So the lawyer says, I am trying to advise the CEO and the board on settlement and I need some information from various components of the company. If, in fact, it is covered by an actual request for legal advice, then yes, that document is going to be required. Actual request, I think the key words in what you just said might be for legal advice. That is correct. And so you need to look at the surrounding... It's revising the CEO on the pros and cons of the settlement legal advice. And we're not seeking documents that are advising the CEO... No, I know. I understand. Is advising the CEO on the pros and cons of settlement by the general counsel, is that legal advice? If the general counsel is advising in her capacity as a lawyer on legal issues... What does that mean, in her capacity as a lawyer? What does that mean? It means that she's bringing to bear her training, her judgment as a lawyer, applying that to the facts, bringing the law to bear. We have, though, in this case, and Barron has not clearly shown... I think you just need a yes or no to that. The bar would like a yes or no to that of I'm a general counsel for a company. I'm advising on whether a settlement is a good idea given the potential legal exposure that we have. Is that acting in the legal capacity or not? Yes. If the lawyer is acting in a legal capacity to advise on the legal ramifications or the legal advisability of entering to that settlement, yes, that continues to be protected. How about advising as the overall advisability of the settlement, taking into account the potential legal exposure? Is that still acting in a legal capacity? Your Honor, that example sounds like the KBR case, where you have a dual-purpose document, in which case the privilege would apply. The issue here, though, is there hasn't been the antecedent showing that the documents that we seek were created for a significant purpose of legal advice. I don't see how you can say that. Isn't it a given that these documents would not have been generated but for the litigation of the patent? Is there any evidence that the general counsel went around the company asking for charts and graphs and PowerPoints on a settlement without the litigation going on? I don't get that. Your Honor, I have two progs to my answer. First question, were these documents generated as a result of the litigation? Your Honor, yes, and that was the earlier decision in this case where it was concluded that the documents were a work product. But there's a separate inquiry in terms of whether or not the documents are protected by the privilege. In there, Barringer, despite opportunities to assert that they were created for the purpose of legal advice, for example, in their privilege log, or at that time when we were going back and forth with Barringer, Barringer had the information. They had the burden to come forward. It's been a long time since I was practicing law and representing corporations, but the question whether to settle a case was oftentimes a business decision for the same reasons that Judge Kavanaugh pointed out. What are the percentages that you would ask the attorney if you're the CEO? What do you think are chances of winning? If we lose, what are our exposure? What do you think they would take for settlement? Can we afford that settlement? And I got those questions as outside counsel, and I think if outside counsel is asking those questions and requesting financial information from the corporation, there would be no doubt whatsoever that that was protected by the attorney claim. So why does it matter if instead of outside counsel, it's inside counsel? It matters, Your Honor, because of the reasoning put forth in the Seals case decision, which is a recognition that in-house counsel wears multiple hats. And we have here Ms. Persky's own testimony that at times her assignment was to negotiate the business terms of these financial deals, which were then used to settle litigation. There are other documents, no doubt, and we're not seeking those, where she is providing the kind of advice in terms of whether or not this is viable from an antitrust perspective. But there are clearly documents where Barringer has not carried its burden to show that she was acting in a legal capacity, and she, in fact, testified that the purpose of some of these analyses was to assess the financial viability. She was asked whether or not that- as communications. The focus has really been in capacity as a lawyer or not, but the privilege focuses on only protects, unlike the word product privilege, only protects communications between lawyer and client. And it just wasn't entirely clear to me, looking at the record, which communications these were. But is that just not-is that because that's not in dispute? We're not contesting that they are communications. They're not? And, in fact, we cite in our brief the case, the TRW case, which recognizes that there are times that communications between non-lawyers could still be part of a communication with a lawyer. However, if a document's never circulated to a lawyer, we think that's a relevant fact to consider in terms of whether or not the purpose of the document was legal advice. So just understanding the implications of this issue for the FTC, have you sought discovery that would get you these facts? For example, the effect on Behringer of a generic entering the market. Have you just sought those facts directly as facts in discovery? Because the communication may be protected, but the underlying information is not. Is that something that just wouldn't help you here for some reason? Your Honor, before I answer, I want to know-I do want to reserve some of my time. You have a lot of time. Don't worry about time. Thank you very much. So, yes, that is a relevant fact, and we have sought documents along those lines. The problem is that we don't have any contemporaneous analyses of these issues at the time that the negotiations were ongoing. And the contemporary analysis gives us information about the economic benefits and burdens of these agreements. But that's what I'm asking. Can you ask them what, you know, 30B6 deposition, ask the person that they produce, you know, what information, you know, did the company have about the effect on its bottom line of a generic entering the market? You know, is that an analysis that you have? Can you answer those questions? Or is that something that you can't get because of word product or attorney-client? If you just go for the information, quiet information, rather than who said what to whom and what historically was produced in response to Ms. Persky. So, Your Honor, we have asked for that information. What we don't have is contemporaneous analyses of that- Why can't you reconstruct that? Sorry to interrupt, but why-piggybacking on Judge Pillard's question. Why can't you reconstruct that rather than piggybacking on the attorney's efforts? Your Honor, two reasons. Number one, we don't have the inputs that would have been used to make those analyses at the time that Barringer was considering these business deals. And secondly, this court actually in the first Barringer decision- I guess I'm not at inputs. What do you mean? I just don't know what that means in this case. So, for example, some understandings of expected revenues from sales if there is generic entry versus if there is not generic entry. What are the costs, for example, of doing- One part of these agreements is a co-promotion agreement. And that co-promotion agreement involved Barr, the generic company in this case, going out and promoting the product Agrinox to OBGYN. And under that agreement, Barr would be paid by Barringer a certain amount of money per visit. Right. And one of the things we'd like to know is, well, how much would it cost Barringer to make those visits versus how much are they paying Barr to make those visits? And is Barringer losing money on that and using that as a means to basically funnel money to Barr in exchange for Barr not entering the market with the generic? Exactly. I mean, I think we understand the business sort of layout. And the question is, if you asked those questions at time X, what was your assessment of how much it would cost Barringer to do that and how does that line up with what you were willing to pay Barr to do that? I understand that those are the- Could you ask those questions directly? At time X, your assessment of, you know, the hit that you would take if generic entered the market, what the value to you is of this co-promotion agreement, are those things that you could just ask directly of somebody in the company rather than saying produce for us historical documents that somebody created for Persky? Like, they just have that information and can you just get it? Your Honor, we asked for that information directly from Barringer, and they refused to produce it on the grounds of privilege and work product. So we don't have anything that is contemporaneous with the entering into these agreements. We have documents and analyses from earlier time periods, but they're not informative to us in terms of what we want- what were the business justifications, what were the cost impacts, what are the profit impacts associated with these particular agreements. They're refusing to produce those to us on attorney-client privilege grounds as well as work product grounds. In terms of the work product under our prior decision, are there things that if there were no attorney-client Barr you could get, you think? In other words, has the work product analysis barrier been removed for some? For a handful of documents, yes. I believe there are about ten documents that we've received since the remand in the prior decision. And they're about what we expected in terms of the nature of the documents. They're numbers. They're financial analyses looking at profits, looking at losses, looking at revenues associated with different generic entry dates. But those are documents where Barringer claimed only work product. And so under the prior decision and the decision of the district court on remand, we now have those. But it's just, like I said, just a handful of documents. There are many others where Barringer has also asserted attorney-client privilege. And we do not believe that they've actually made the showing, that the record at best for Barringer here is ambiguous. We have the absence of legal advice indicated as the purpose in the privilege law, which is an important part because that's under the federal rules, under the FTC's rules. That's what we, as the recipient of the document, or the hoped-for recipient of the document, that's all we have to go off of initially. And then we have the- Can you, just to follow up on my earlier question, can you point me to, in the record, and it may not be in the appendix but in the district court record, where I would find the discovery requests that you made that you think should have produced the information that you're still trying to get? Like, is there anywhere that I should look just for how those are framed? Because I think that makes a difference in terms of whether you're running into or getting around the attorney-client privilege. So, Your Honor, I will double-check between the time that I'm- when I'm sitting down before my rebuttal. But it is- so I can give you the precise joint appendix numbers. But I'm quite sure that we attached either our CID or our subpoena that requested this information. And so I can give you the exact pages where you would find that. Thank you. Ms. Davis, can I ask you the dichotomy between attorney-client and work product? The documents that would be covered by a privilege, if any privilege, that only work product, are they ones that were not requested by the general counsel? To be generated, is that the dividing line? They may have been requested by her for purposes of analyzing the business terms of the deal. Eringer did not assert attorney-client privilege over those. They did maintain that they revealed, and they do are maintaining on appeal here, that they do reveal her opinion. But the district court found that in terms of the kind of weeding and sifting through facts that might reveal an attorney's opinion, that isn't apparent from these documents. Is it conceded that those- these work product, potential work product documents were all created in anticipation of litigation? Yes, Your Honor. We did not dispute- There were a number of documents concerning this co-promotion agreement where we, in the earlier appeal, we did dispute whether or not they were created as a result of litigation, but this court concluded that they were, and we haven't continued to push that issue. Does that concession apply to all documents that you sought? It applies to all documents where the claim is work product, Your Honor. What about an attorney-client? That's a separate issue, Your Honor, in terms of the standards for attorney-client privilege differ from work product. Yeah, I understand that. Does that concession mean that all documents that are covered or potentially covered by the attorney-client privilege were created in anticipation of litigation? For attorney- in anticipation of litigation. Not necessarily, Your Honor, because of this reason. You do not need to have litigation anticipated. I understand that. So that's in the facts, not the law. That's a factual question about this case and those particular documents, not legally. In fact, the whole reason for the question is that attorney-client privilege doesn't require that, but it might bear on the attorney-client privilege's application if they were in fact- That is exactly the point. It may not be required, but it may bear on the existence of it. Yes, I understand, Your Honor. And we've not actually examined each document to see if there were any that don't work, but let us assume for these purposes that, yes, they were all created in this umbrella of what was going on in Barringer at the time, but we also know that there were specific business analyses that are taking place that we don't think Barringer has made the showing that the request for the document was for the purpose of legal advice. And it comes back to this court's case or decision in Ray Seal's case in 1984 that recognizes that in-house counsel have these multiple roles, particularly someone like Ms. Persky, who was senior vice president. She was part of the executive suite. The difficulty for us is under Artavis, the legal question is very sort of shot through with business questions. The very issue of whether they were paying a reasonable amount or overpaying to settle bears on whether this meets the rule of reason or not. And so it's just extremely hard as a practical matter to sort those things out. And there may be financial and business components of legal advice. And so I guess we're really asking you at a more concrete level how you would have us distinguish those. We understand at the general level, and we are on board with our precedent that says that high-level executives, and we have to be, of course we are, that high-level executives wear different hats, but the rubber hits the road on a more concrete level. So any concrete guidance on that from either side is helpful. Let me just ask you, is the question whether Barringer has met its burden here a factual question, a legal question? The question of whether or not Barringer has met its burden, I believe, would be a factual question, but you have to make that determination based upon the right frame of analysis. And that's where we think the district court committed the legal error in that the district court looked at two principal factors, the fact that Ms. Persky was an attorney and the fact that it was under this umbrella of litigation settlement. And that's very similar to the error that this court found in the first Barringer decision where it said that the mere fact of general counsels requesting the documents in the context of litigation wasn't enough to show that these documents were opinion work product. That's a different issue. Opinion doesn't have to be opinion to be attorney-client privileged. That's right, Your Honor, but just in terms of the type of error that was made, we believe it's similar in terms of both. I'm not sure I'm seeing that because the attorney can ask for factual information to help the attorney provide legal advice, and that will be covered, of course, by the attorney-client privilege. I don't see how our first opinion in this case bears on that question. Well, the first opinion bears on the question in this way in terms of, based upon the teaching of other cases that have addressed whether or not attorneys or companies claiming the privilege have made the clear showing, they look at the content of the documents. And what we at the FTC know and the public knows about the content of those documents is described in the Barringer 1 decision. And the content of those documents are financial analyses. Now, I understand the point that if that financial analysis had been requested in order to provide the legal advice, it would at least have a dual purpose and under KBR be privileged. So you said that the district court looked at whether Persky was acting as a lawyer, was a lawyer, was a lawyer, sorry, and whether these communications took place in the context of, or as you said, under the umbrella of litigation settlement. You've conceded that they were communications between her and the client. And you say those factors don't suffice. What more would be required, in your view, should be required, is required, to meet the burden? Well, at a minimum, the privilege log should indicate that the purpose of the document was legal advice. And if it just so says, as a conclusionary matter, that suffices? That certainly is a fact in favor of a finding that it was for legal advice. Does it suffice? Does it suffice is the question. It depends upon the surrounding facts, Your Honor. What other facts might bear on that? So here we have the testimony of Ms. Persky talking about what her assignment was from the company. And her assignment was to be the lead business negotiator. That suggests that at the time she was requesting at least some of these documents, she was asking them for the purpose of analyzing the finances, the financial aspects of this deal, not the legal aspects of this deal. And she was given the opportunity to clearly state whether or not the purpose of these analyses were business or legal. If I could point the Court to the portion of the record at JA-776. If we go back to JA-590, she asked other senior executives, non-lawyers, Paul Fontaine and Marty Carroll, to give her information parameters that she needed to negotiate the terms of the settlement. So that's at JA-590. She was then asked, what was the purpose of getting these figures? And she responded, quote, for parameters within which I would be able to negotiate the deals. Is negotiating a settlement a legal task? It could be legal if it's dealing with the legal issues. But we clearly read... That seems circular. What do you mean if it's dealing with the legal issues? Well, for example, in this case, the settlement dealt with, among other things, whether or not there had been, whether the patent had been infringed or whether the patent was valid. And so negotiating terms in terms of the validity of the patent and raising legal issues, yes. But if you're then using a business deal in order to create some money to settle the case, the merits of that business deal we believe is business and not legal. With respect to, however, if you're looking at the merits of that deal to run them through an antitrust analysis to determine whether or not it passes muster under the antitrust laws, well, then the documents created for that purpose, yes, would be subject to the privilege. I'm very confused. The legality of the settlement turns on... You draw a dichotomy between the legal aspect and the business aspect. But in this situation, the legality of the settlement turns on the business aspect. So how can you draw a line between what is business and what is legal if the legality turns on the business considerations? There are documents, though, that were created for the purpose of assessing the profitability, was this a good business proposition for Barringer? And Barringer has not in its... That bears on the legality. We have to look at the underlying purpose for why that document was created. At the time it was created, did Ms. Persky request it in order to determine whether or not this was within the acceptable financial parameters? It's a separate matter in terms of whether or not these financial parameters raise the possibility of legal liability for Barringer, and no doubt there were times when Ms. Persky would have been advising the company on those matters. We're not seeking those documents. In terms of what Ms. Persky testified to, she made clear that the purpose of these financial deals or some of these financial analysis were business. At JA753, for example, she was asked whether or not these deals made sense from a financial revenue standpoint, whether that was business or legal advice. And she said, whether they make sense from a financial business perspective is business. A bit later, at JA778, she was asked about another set of analyses. She was asked specifically, in what context did you ask for an analysis of the Mirapax Patent Challenge pre-Barr negotiations? She answered, to help me assess litigation strategy. So Ms. Persky was able to identify whether or not the purpose was business or financial versus legal. We've gone way over, so why don't we all get more time on rebuttal, so why don't we hear from the other side, and then we'll give you plenty of time on rebuttal. Thank you, Your Honor. May it please the Court. The analyses on the attorney-client privilege issue that are critical are the factors that the magistrate judge found, as a matter of fact and not clearly erroneously, made this an endeavor where the general counsel was getting these documents for the purpose of providing legal advice. And there are several critical factors here that the magistrate judge found. First of all, in response to several of the questions, every one of the documents at issue in this case was already determined to have been created because of litigation in the first Barringer case. There's no document at issue that was not created because of litigation. Secondly, the specific context here is important, because the settlement agreements that were reached in this case, everyone knew were going to be turned over to the FTC for the purposes of analyzing antitrust compliance. So this is a situation where it's litigation settlement and the settlement agreements are being turned over to the FTC. Third, all of these documents, there are factual findings by the magistrate judge below, were either created by Ms. Persky or she directed their creation. And the magistrate judge said for the purpose, at least in part, of providing legal advice. There may have been some business aspects, but part of it was to create legal advice. And fourth, this was all done based on consultation with outside counsel who suggested that this was critical analysis to be done for the purposes of antitrust compliance. That's all in the record. In these circumstances, we believe there can be little question that this was done for the purpose of soliciting and providing legal advice. And the magistrate judge's conclusions to that effect are fully supported by the record. I just want to be clear about that. You said every document was either created by the general counsel or requested by the general counsel. Yeah. So why is there a residual work product? So when at the time, so first of all, this is a huge document production. There were over 270,000 pages of documents produced to the FTC, and we're talking about thousands of documents. And for some of the documents where only work product was asserted, at the time the privilege was asserted, there was not enough evidence to say for sure whether the document had been created for the purpose of soliciting or receiving legal advice. And so for the relatively small group of documents, where there wasn't enough evidence at the time, only an attorney work product designation was made, not attorney client. It just had to do with the evidence available at the time and the scope of the production. Is there a distinction between those documents and the attorney client privilege documents that you can identify at this point? Part of the distinction is that originally in the record, there was much better evidence from the general counsel herself and other lawyers that specific documents had been created for the purpose of soliciting or receiving legal advice. And for others, there just was not the same level of evidence. For a few of those documents, it's possible that perhaps additional privilege could have been claimed, but based on the record at the time, we made the best designations that were reasonable under the circumstances. But for the documents at issue here, all of the documents do have at least an attorney work product designation, and the court stated in the first Berringer opinion that those were all created because of litigation. So what's your response to, maybe you just answered this, but they haven't all been specified in the privilege log as having been attorney client communications? They have. They have. So either in the privilege log or in subsequent amendments, but before a magistrate, Judge Paciola, back in, I think it was 2012, actually it was more like 2011, looked at all of this, all of the documents at issue here had the current designations, attorney client, attorney work product, or both. And I think the privilege log argument that Mr. Hegedus makes is both incorrect and a bit of a bait and switch. It's incorrect because when one designates something as attorney client, inherently that designation means that it was a document created for the purpose of giving or receiving legal advice. But for a review in court, what we're used to seeing is requests by Ms. Persky to Larry Rosenberg on August 5th concerning copromotion dealers, something that is not just a lawyer's post hoc labeling, but something that gives us a little bit of a sense of concreteness to that. And do we have that information? I did not see that for every document. Not for every document, no, but for many of the documents, yes. And I think part of this was that this was a massive production. And when I say it's a bit of a bait and switch is, number one, the FTC agreed to the sampling procedure that was used by Magistrate Judge Facciola that he suggested. And so there were 600 documents that the FTC challenged on our privilege log. And we agreed to submit, I think it was 88 documents, to Magistrate Judge Facciola. And for those 88, we provided individualized document-by-document support for the privilege designations. And that was in the form, at least in part, of in-camera affidavits, but the FTC didn't object to that at the time. We had a hearing before Magistrate Judge Facciola did not object and had every opportunity to object and did not object. And so there was individualized document-by-document showings for all of that. We asked at the time, do we need to go back and amend our privilege logs in light of the additional information and the agreement we made with the FTC was no, that we did not need to go back at that point, at least, and amend the privilege logs. So based on that sampling procedure that the FTC agreed to, I think any concern that the privilege logs were not as robust as they could have been really falls by the wayside. That's not the issue. So what about the underlying information? And you heard my questions to Mr. Haggadahs. What if the FTC asks directly, at time X, what was the financial posture for Beringer of getting co-promote? What was the scope of their access that you expected to be able to take advantage of if you agreed with them? What was that worth to you? How do you know? What were you thinking at the time? What was the bite that might be taken out of your market if they entered it at X time? That's information that is not covered by the privilege, right? It may not be, particularly if it's not asked to a lawyer. And they had the opportunity and did ask many, if not all, of those questions in their investigational hearings. And they got responses that were not objected to. I don't believe that at least the vast majority were not objected to. And I believe they got a lot of that information. And they certainly could have in the investigational hearings. What they're seeking here are specific documents that, as we've already said, were created specifically because of the litigation, not ordinary course documents. All of the ordinary course documents that bear on this have been turned over to the FTC. And they have a legion of economists that can analyze those documents. And as Your Honor suggested, they can reconstruct the financials themselves. And they have. They've made public statements about what they thought the financials of this deal entailed. So there's no real issue of them being prevented from getting basic information about this that's necessary to evaluate the financials of the deal. Broader question. You and your amicus say that if the privilege is not recognized in these circumstances, that's really going to destroy the privilege, harm in-house counsel. Ultimately, a lot of negatives come from that. On the other hand, the FTC says recognizing the privilege here really opens a door to abuse of the privilege and improper protection of documents that are really business documents that have been shielded with the privilege label. How do we, from your perspective, prevent the abuse? Or how can we write this so as to draw a line that prevents abuse and respond to that concern? I think this Court's precedents give a lot of the guidance there because ordinary course documents that were already created that are business documents simply because they're provided to a lawyer don't become privileged. That's, I think, black-letter law. And that's really the distinction, at least in this case. None of these are ordinary course documents. Well, that's not the full answer. The lawyer could, armed with a ruling in your favor in this case, start becoming the requester of financial documents beyond the situation we have in this case. You understand the question? Yeah, I understand the question. Let me put it this way. I don't think that's a problem because I think that what the magistrate judge did and all the cases that have been cited suggest is you have to look at the context. And here you have the context of settlement of litigation where, as Judge Randolph pointed out, the legalities depend on the business realities because fair market value, for example, is a critical determinant for legality. Let me just ask basically the same question Judge Kavanaugh asked only in the context of the Octavius deal. And maybe it's a problem with Octavius, and maybe it's a problem with these type of settlements and ever being able to prove that they're anti-competitive. But these are not going to be documents that are kept in the ordinary course. These are always going to be valuations that are done in the context where the claim has been made by the generic that your patent doesn't cover, and you turn around and make a contrary claim, and then the deal comes up. So it's a business that is of its nature on a law foundation, on a litigation rest foundation. So there's not going to be ordinary course documents. So then the question becomes, given that the Supreme Court thinks under Octavius that the proof of anti-competitive behavior is highly dependent on the financial realities, the question then becomes, how does the FTC have access to those financial realities? And I take it your answer is, or maybe this is my answer, and I'm asking you whether you accept it. They can ask all those questions and get all that information as long as they don't ask it in the form of what documents did your lawyer request and get. If they can say at this time when you were considering whether to file this case, what were your understandings? I think effectively you're right. I think that's right. I think the other thing is, remember, the FTC has the settlement agreements themselves. Well, the settlement agreements are just the end product, but they need context. Yeah, but they have all the financial terms, and they can decide based on. And while you're right that certain of the information, such as a co-promote done only in the context of litigation, might not be available in ordinary course forms, generic entry forecasts, I mean pharmaceutical companies do this every week, so they do have, and they do have generic entry forecasts here. If generic entry happens on a certain date, what will that do to our profits? They have a lot of that stuff. Maybe not the specifics of how the co-promote affects it, but they have a lot of other information. And yes, you're right, they can ask most of that, particularly if it's not to a lawyer. If they ask the business people, when you were looking at this from a business perspective, what were the economic considerations you were looking at, of course they can ask that. And the business people might be persky in this situation. Well, I don't think so, but they had numerous investigational hearings. There was Paul Fontaine, Elizabeth Cochran, numerous business people who were involved in the deal, involved in negotiating, involved in putting together some of this information, and they were able to ask them all about the business aspects of the deal. And they got answers? And they got answers. Do you want to talk a little bit about work product? Sure. So obviously the attorney-client is the primary focus of the case, and it affects the majority of the documents. On work product, we believe that while the magistrate judge really did a thorough job in looking at everything, that he made two legal errors. One of those legal errors was not considering the ex-party portions of Ms. Persky's supplemental declaration. And that is important. I know you have that in the in-camera appendix, and I would just suggest. He said that that wouldn't affect the bottom line. He said it wouldn't affect the bottom line because he said that he looked at it and he thought that it divulged that Ms. Persky directed the creation of most of these documents, but didn't personally create them herself. And I don't think that's the real legal significance. The question is, are her mental impressions contained in the documents? And when you look at the way she explained the mental impressions in that in-camera portion, she goes element by element and says, look, this document had five factors, and there were columns corresponding to the five factors. I chose those five factors because I thought they were the factors that were relevant to antitrust analysis and legal compliance. And so giving the FTC those documents shows the factors that she thought were important, and we believe that even under the Behringer 1 standard, that shows a sharply focused and weeded analysis because there are literally dozens of factors you could consider in determining whether it's fair market value or whether it's. . . What's the second legal error then? And then the second legal error was I think the magistrate judge overread the first Behringer decision. And, well, I think he said, look, they didn't actually decide this issue. I feel very constrained in determining whether this is opinion or fact. And I think . . . So do I. I meant . . . I mean, we have to, in your brief as forthright about this, we have to follow the first opinion. And it does lean hard in favor of fact rather than opinion here. It does. Although, you know, if the court had intended, I think, to actually resolve the issue, then why remand? And it did remand for that determination. I think the court wanted to give guidance, and it certainly did. We obviously think that some of that decision is legally incorrect, but unless the court . . . If it's fact, work, product, then that's it, right? Well, under that analysis, and I do want to just say, well, this court can't revisit it. The substantial need analysis in the first Berger decision, we believe, is really sort of off the rails because it says that substantial need is mere relevance. And mere relevance is determined by whatever the FTC says it means. And the court acknowledged that it created a circuit split in making that ruling the first time. I understand this panel can't itself do anything about that, but that is an issue that if the court felt it appropriate to rehear en banc, certainly it could do so. But our point is that we think that these two legal errors sort of led to the magistrate judge not getting to the right answer on work, product, as I've said. Just before you sit down back on the work, product question and on the burden, you believe that you have met your burden with respect to each and every one of the disputed documents. Yeah, because of the sampling, you know, I think, yes. I mean, the answer is yes. And there is overwhelming evidence here. This isn't a situation like in some cases where somebody just says it's privileged with no explanation. I mean, we have detailed explanations. And certainly with the sample documents for each and every document, there are detailed explanations in the record as to why those are attorney, client, work, product, or both. And so any burden that we shoulder, we think we've met in this case. Just as a judge, when I look at these financial reports and look at the entries in the privilege log, it doesn't seem obvious to me how to assess the assertion that that is provided in seeking legal advice. Any guidance on that? Well, I think some of them are more robust, as we've said, and some are less robust. But they assert attorney-client privilege. And by definition, that means they have to have been created for the purpose of seeking or receiving legal advice. And what Mr. Hegedus is saying is, well, some entries specifically spell that out. They say this document was created for the purpose of seeking or receiving legal advice, and others just say attorney-client privilege. And I don't think there's a meaningful difference, particularly at the initial privilege log stage. Well, every email I get from my lawyer friends says attorney-client privilege on it, and they're typically not giving me legal advice. They're just saying, when are we going to have lunch? And so the fact that something's labeled that way, I mean, you have to appreciate the position we're in, where we're supposed to be making an independent analysis of this. And if you say, well, our labeling or our saying that something is attorney-client, it can't be enough. Well, I think in a different context, maybe it wouldn't be. But here, we're again, you know, we agreed to a sampling procedure. We agreed to have more robust discussion of those 88 sample documents. We did have that discussion. There was no objection in the district court at the time. And then we agreed we didn't have to go back and rejigger all the privilege logs in light of the additional discussion. I think in this case, that certainly suffices. You know, I'm not saying that in every case, just saying attorney-client privilege suffices. But when you're talking about, I think, the practicalities of litigation, you're talking about, you know, 10,000 or more documents being produced. You're talking about, I think it was over 2,000 documents that were withheld on the basis of privilege and then 600 being challenged. As you narrow the scope of the dispute in litigation, additional explanation can be provided. I'm not aware of any case that has said that a party waives an attorney-client privilege designation by not making a more robust showing in the initial privilege log if there are later iterations of the log or later back and forth between the parties about justifying the privilege. So you'd be willing to provide more information on any of those documents? Yes, of course. To support the claim of privilege? Yeah, absolutely. Okay, thank you. Thank you. Your Honor, just a few points, and I'll be brief. With respect to Judge Pillard's question regarding the record and why we asked for this information, I would direct the Court's attention to Joint Appendix Pages 35 and 36. And there you'll see the specifications from our CID. Excuse me, it was a subpoena. And Specification 910 on Page 35 and Specification 21 on 36 ask for this kind of information, and we did not receive any of this information contemporaneous with the negotiation of these deals. With respect to asking for that information from Barenberg business people, we did ask for that information during the investigational hearings, and the business people refused to provide us with that information on the grounds of privilege. With respect to drawing the line. To claim privilege? Yes, Your Honor, or work product. I'd have to go back to see which specific privilege was put forward with respect to those objections, but it was one or the other, and often relying upon the fact that they were working with Ms. Persky and so couldn't provide that information. But can you ask them at that time to reconstruct what the financial picture was? I don't recall. I wasn't involved in those IHs specifically, so standing here today, I couldn't tell you precisely what the question was. And the point of these, and this is Judge Pillard's question too, I think, the point of these privileges is, in essence, not to allow the adversary to piggyback on the lawyers for the other side, but you can directly ask the underlying witnesses what happened, what was the financial picture, depending on the nature of the case. And I guess I'm not sure why that couldn't have been done here. My understanding of what the lawyers involved in the proceedings have told me is that they asked for that kind of information, and the witnesses refused to provide it to them.  One is to ask for existing documents, and it may be that existing documents were only, you know, given the nature of these claims and how these business deals come about in response, essentially, to an antitrust dispute or risk of an antitrust dispute. Have you also asked in a form that isn't dependent on existing documents, like a 30B6 deposition or other form where you're saying, bring us the informed person so that we can ask these questions that may require you, Barringer, to reconstruct or to generate something for this purpose? Is that not a practice that you follow? Oh, no, it is a practice that we follow, and we followed it here. We just did not receive the information when those questions were posed. And you followed it here. Okay, so these are document requests that you pointed to, the specifications, but you also followed it in the hearings? Correct, Your Honor. We received both the responses to the subpoenas as well as we took investigational hearings on these issues. But this points to, in terms of questions of line drawing and providing guidance, I think one bright line might be that if a company decides to ask the general counsel to negotiate a business deal, then the company needs to be careful about whether or not the negotiations are involving business issues or legal issues. And this Court hinted at that in the first Barringer decision when it stated that a company may select an executive who is a lawyer to negotiate the business terms of a settlement, but that doesn't mean that the lawyer's thoughts relating to financial or business decisions are opinion work product. Now, I grant you they're addressing work product there, but in terms of the advice, in terms of be careful when you appoint general counsels or in-house counsel to carry out business negotiations, courts are concerned about whether or not that is being used as a way to cloak business documents within the privilege and improperly. Just a few more points, Your Honor, with respect to the co-promotion agreement. We have nothing contemporaneous, and that information is really very important to understanding. How much Barringer was willing to part in terms of money towards 2-2 Barr in return for Barr not entering and preserving Barringer's profits. With respect to... Your case would be entirely different or your presentation if we didn't have a general counsel but we had an outside counsel? Yes, Your Honor, it likely would be... Outside counsel in a patent case. We have a greater... But the case law recognizes that there are different roles played by in-house and outside counsel, although the Gulf and Western case was a case where actually outside counsel was found to be playing business roles, so that's why I'm hesitant to say it can never happen. But on this issue of the descriptions in the privilege law, the federal rules require companies and parties asserting the privilege to provide a description. So it can't be simply enough that you slap AP or AC for attorney-client privilege in the law and say, okay, that's it. We have to be able to rely upon the description itself. Can you identify... I think you did 671. Can you identify privilege assertions that you think are among those in the sample that you think are clearly inadequate as a matter of bearing or meeting its burden? Yes, Your Honor. So the privilege entries that I contrasted were 617, which is found at Joint Appendix Page 331, and that is one where legal advice was not identified as a purpose. Are there others? Do you have a list of all the others where you think it wasn't identified? Your Honor, actually it's an appendix to our brief where we have listed the entries where attorney-client privilege was claimed, but there's no indication in the description that it was for legal purposes. And the last point, the sampling agreement that we had with Behringer did not bear upon whether or not the descriptions they put in their privilege law. I mean, they are what they are, they were what they were, and that agreement before Judge Festiola had nothing to do with whether or not we could dispute what should be concluded from those descriptions. Your Honors, if you have no further questions, we urge you to reverse the district court. Thank you. Challenging case. Thank both counsel. Thank you, Your Honors. Case is submitted.
judges: Kavanaugh, Pillard, Randolph